# In The United States Court of Federal Claims

(Electronically Filed on January 31, 2005)

Nos. 98-483C, 98-485C,
01-116C, 01-551C

****************************************

| | |
|---|---|
| **FLORIDA POWER & LIGHT** | * |
| **COMPANY, DUKE POWER,** | * |
| **a division of DUKE ENERGY CORP.,** | * |
| **NEBRASKA PUBLIC POWER** | * |
| **DISTRICT, PSEG NUCLEAR, L.L.C.**, | * |
| | * |
| Plaintiffs, | * |
| v. | * |
| | * |
| **THE UNITED STATES**, | * |
| | * |
| Defendant. | * |

****************************************

**Alex D. Tomaszcuk**, Washington, D.C., for plaintiff. **Jay E. Silberg**, **Devon E. Hewitt**, **Daniel E. Herzfeld** (Nos. 98-483C, 98-485C), **Jack Y. Chu** (Nos. 01-116C, 01-551C), of counsel.

**Marian E. Sullivan**, Trial Attorney (No. 98-483C), **Russell A. Shultis**, Trial Attorney (No. 98-485C), **Heide L. Hermann**, Trial Attorney (Nos. 01-116C, 01-551C), and **Harold D. Lester, Jr.**, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were **Robert D. McCallum, Jr.**, Assistant Attorney General, **David M. Cohen**, Director, for defendant. **Bryant S. Banes**, **Kevin B. Crawford**, **Timothy P. McIlmail**, **R. Alan Miller**, **William L. Olsen**, **Erin E. Powell**, **Victoria Strohmeyer**, Washington, D.C., of counsel. **Martha S. Crosland**, **L. Dow Davis, IV**, **Jane K. Taylor**, United States Department of Energy, Washington, D.C., of counsel.

**OPINION AND ORDER**

Plaintiffs, the Florida Power and Light Company ("Florida Power"), Duke Power, a division of Duke Energy Corp., ("Duke Power"), the Nebraska Public Power District ("Nebraska Power") and PSEG Nuclear, L.L.C. ("PSEG") are among 65 civilian title-owners or generators of nuclear waste ("utilities") and other interested parties that have sued defendant, the U.S. Department of Energy ("DOE"), alleging that DOE breached an agreement to begin disposing of their nuclear waste in a permanent deep geologic system ("repository") before a January 31, 1998 deadline ("disposal deadline") as set out in a contract ("Standard Contract") with each utility that was mandated by Section 302(a)(5)(B)[\1] of the Nuclear Waste Policy Act of 1982 ("NWPA" or "Act").[\2]

Now before the court for decision are the parties' cross-motions for partial summary judgment on the intended rate of SNF acceptance, defendant's motion for partial summary judgment regarding greater than class C ("GTCC") waste, and defendant's motion to dismiss plaintiffs' takings claims.

Prior to deciding any of these motions, however, the court must ascertain that it possesses subject-matter jurisdiction over plaintiffs' claims, as it may do, sua sponte, at any stage of a proceeding. See **Kontrick v. Ryan**, 540 U.S. 443,

---

\1 Section 302(a) orders DOE to enter into contracts with the utilities for the disposal of their SNF in exchange for the payment of fees. Section 302(a)(5) directs these contracts to provide that:

> "(A) following commencement of operation of a repository, the Secretary shall take title of the [SNF] involved as expeditiously as practicable upon the request of the generator or owner of such [SNF],"); and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the [SNF] as provided in this sub-title."

\2 See Pub. L. No. 97-425, 96 Stat. 2201-2263, codified at 42 U.S.C. §§ 10101-10126 (January 7, 1983). Section references throughout are to the NWPA.

124 S.Ct. 906, 915 (2004) (citing **Mansfield, C. & L.M. Ry. Co. v. Swan**, 111 U.S. 378, 382 (1884)); **Capron v. Van Noorden**, 2 Cranch (6 U.S.) 126, 127 (1804) (judgment loser successfully raised lack of diversity jurisdiction for the first time before the Supreme Court); United States Court of Federal Claims Rule ("RCFC") 12(h)(3). See also **Arctic Corner, Inc. v. United States**, 845 F.2d 999, 1000 (Fed. Cir. 1988) ("A court may and should raise the question of its jurisdiction sua sponte at any time it appears in doubt"); **Special Devices, Inc. v. OEA, Inc.**, 269 F.3d 1340, 1342-43 (Fed. Cir. 2001) (court may rule on its subject-matter jurisdiction at any point in the litigation, even if the issue is not raised by the parties).

The question of whether jurisdiction existed was raised in the court's order to show cause (OSC), issued on October 14, 2004, and incorporated as an appendix hereto (as redacted to correct errors and irrelevant matter).

Having carefully considered their responses to the OSC, the court decides that neither party has shown good cause why this court should not dismiss, for lack of jurisdiction, plaintiffs' contract damages claims arising from DOE's failure to comply with the statute requiring DOE, under the Standard Contract, to dispose of their SNF by January 31, 1998.

As more fully discussed in the OSC, which is set out in full below, the court concludes that plaintiffs' claims for damages caused by DOE's alleged failure to comply with the Standard Contract under Title III—specifically, with the deadline for SNF disposal in Section 302(a)(5)(B)—whether styled as claims for damages for breach of contract or as petitions for regulatory review, must be brought in an appropriate Federal court of appeals, pursuant to Section 119 of the Act.

The court remains persuaded that Congress intended in Section 119 of the Act to confer on the appropriate U.S. Circuit Court of Appeals or the U.S. Court of Appeals for the District of Columbia the original and exclusive jurisdiction to entertain challenges to the Secretary's action or failure to take an action required under Title III of the Act. The D.C. Circuit so held in the first challenge to the Act, in 1985, see **Gen. Elec. Uranium Mgmt. Corp. v. DOE**, 764 F.2d 896 (D.C. Cir. 1985) and consistently has exercised such jurisdiction ever since, with

the notable exception of **Wisconsin Elec. Power Co. v. DOE**, 211 F.3d 646 (D.C. Cir. 2000) (suggesting that breach of contract claims under Section 302 belong in this court).

Section 119 does not explicitly include challenges to agency action under Title III of the Act, which includes Section 302(a)(5) (see n.1, supra), the provision at issue here. However, considering that no other forum for such appeals is designated, including this court; that the statute and legislative history indicate that any exclusion was a drafting error or oversight; and given the overall structure and purpose of the Act, there can be little doubt that the failure to include Title III in the category of statutory provisions subject to review under Section 119 was inadvertent error.

If all other actions under Title III of the Act, including under Section 302, are subject to review under Section 119—including other portions of Section 302 that also are required to be included in the Standard Contract, such as fee-mandates—there would appear to be no justification for treating actions dealing with an action or failure to act under Section 302(a)(5) any differently. Consolidating in one court the review of all disputes under the Act (including nominally contractual claims) is both legally correct and, as the Congress envisioned, critically important in a statutory and regulatory regime that is as vital, costly, and complex as the nation's nuclear waste program.

The Parties' Responses to the OSC

Defendant agrees with the court's conclusion that, consistent with the court's exclusive jurisdiction over contract claims for money damages, prior court of appeals decisions such as **Indiana Michigan Power Co. v. DOE**, 88 F.3d 1272, 1277 (D.C. Cir. 1996), and **Northern States Power Co. v. DOE**, 128 F.3d 754 (D.C. Cir. 1997) ("**Northern States II**"), are not binding on this court with respect to contractual matters. Defendant is unable, however, to discern any basis for modifying its historical position in other NWPA-related litigation that this court is the proper forum for claims arising under the Standard Contract.

At the intersection of these principles, defendant strongly urges the court to disregard the D.C. Circuit's contract determination that precludes DOE from relying on the unavoidable delays provision at Article IX of the Standard Contract to excuse its failure to perform due to the unavailability of a repository or an interim storage facility, and to dismiss based on its own contract determination that DOE "was not obligated to provide a financial remedy" for its failure to dispose of SNF by the deadline because the delay was unavoidable.

Plaintiffs argue that the court' ruling is barred by principles of res judicata and stare decisis—and that defendant should be judicially estopped from arguing that the appeals courts have jurisdiction over Standard Contract claims. They contend that the court has ignored the proper distinction between challenges regarding DOE's statutory obligations and those involving its contractual obligations, and that the court's concerns about bifurcating review do not apply to breach of contract claims.

## DISCUSSION

Plaintiffs' assertion that statutory contracts such as this must be treated exclusively as contracts is belied by the Federal Circuit's acknowledgment that the government's statutory obligations, are enforceable in a Federal court of appeals, not in this court, even when these obligations also have been incorporated in a contract. Two circumstances in which statutory obligations in a contract were found not to be enforceable by actions for breach of contract were identified in **City of Burbank, California v. United States**, 273 F.3d 1370, 1373 (Fed. Cir. 2001). Both circumstances exist here.

In **Burbank**, a government agency, the Bonneville Power Administration ("BPA") entered into contracts to sell surplus electrical power. Some contract terms were freely negotiated, while others were mandated by the Northwest Power Act ("NPA"). The court concluded that the provisions that were "statutorily mandated" or "arrived at via an administrative hearing in which the pertinent facts are reflected in an administrative record" were subject to judicial review in the Ninth Circuit, under a judicial review provision comparable to Section 119 of the Act, see 16 U.S.C. § 839f(e)(5) (challenges to a BPA "final action or decision" taken pursuant to the statute "shall be filed in the United

States court of appeals for the region,”).[\3] **City of Burbank**, 273 F.3d at 1380. Inclusion of these contract provisions pursuant to statutory mandate is deemed to constitute action taken pursuant to the act. See **id.** at 1379-80.

In contrast, only “where alleged breaches of contract pertain to terms freely negotiated in an arms-length transaction, and facts pertinent to those negotiations fall outside an administrative record,” must claims based thereon be brought in this court. **Id.** at 1380 (emphases added).

There can be no doubt that in this case: (1) the contract term—the disposal deadline—was statutorily required to be included in the Standard Contract, and not freely negotiated; (2) an administrative hearing regarding the Standard Contract, including the disposal deadline, was held, and it included notice, comment, and opportunity to present facts as part of the administrative record on the specific points at issue here; and (3) there is no evidence that facts regarding the rule-making fell outside the administrative record. This result obtains even when the plaintiff asserts its claim as one for breach of contract, so that contract treatment does not permit “collateral attack on the [NWP] or a regulation” promulgated thereunder. **Id.** Thus, because the deadline was neither negotiated nor negotiable, it is not subject to review in this court. Therefore, **Burbank** requires dismissal of the contract claims in this case.

---

\3 16 U.S.C. § 839f(e)(5) provides in relevant part:

> “Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. §§ 832 et seq.], the Act of August 31, 1964 (16 U.S.C. §§837–837h), or the Federal Columbia River Transmission System Act (16 U.S.C. §838 and following), shall be filed in the United States court of appeals for the region.”

Review of other Statutory Terms in Standard Contract

The NWPA also includes a mandate, much like the mandate that Standard Contract "shall" include the disposal deadline at Section 302(a)(5), that the Standard Contract "shall" provide for utilities' payment of fees to offset Fund expenditures on repository program activities. See Section 302(a)(1). See also 10 C.F.R. § 961.11 ("Standard Contract"), Article VIII ("Fees and Terms of Payment").

Disputes over these fee terms have been brought in the Federal courts of appeals. In fact, the D.C. Circuit asserted jurisdiction over an issue arising under the Standard Contract even when it involved a term not mandated by the statute, to wit, the regulatory interest rate to be applied to unpaid fees for waste generated prior to April 7, 1983. See **Commonwealth Edison v. DOE**, 877 F.2d 1042, 1045 (D.C. Cir. 1989); see also Standard Contract, Article VIII(B)(2) (payment of fees for "SNF discharged prior to April 7, 1983").

The D.C. Circuit also took jurisdiction of a challenge to the Standard Contract method for calculating the one-time fee mandated by Section 302(a)(2). See **Gen. Elec.**,764 F.2d at 897. Although this method is not laid out in the Act, but only in Article VIII(A)(2) of the Standard Contract, the D.C. Circuit rejected the trial court's holding that the dispute was outside the scope of the Act's judicial review provision. It held instead that DOE's Standard Contract implementation of the statutory fee provision was "well within the class of agency actions reviewable under Section 119(a)(1)(A)." **Id.** at 901.

In their responses to the OSC, plaintiffs agreed "there is no dispute" that Section 119 "governs challenges to agency actions under NWPA Section 302(a)(5)." Thus, DOE's failure to meet the Act's disposal deadline, like the fee-setting challenged in **Commonwealth Edison** and **General Electric**, is a challenge to a DOE action or failure to take action under a statute and, as such, well within the class of agency actions reviewable under Section 119.

NWPA Repeal of Tucker Act

Plaintiffs contend that the OSC interpretation of the statute endorses a partial repeal of the Tucker Act by the NWPA, in contravention of a cardinal principle of statutory construction, that "'repeals by implication are not favored.'" See **Ruckleshaus v. Monsanto Co.**, 467 U.S. 986, 1017 (1984) (quoting **Reg'l Rail Reorg. Act Cases**, 419 U.S. 102, 133 (1974)).

The OSC rejection of the notion of extending the court's jurisdiction to regulatory cases, however, does not implicate this doctrine, but rather another doctrine, grounded in principles of sovereign immunity and separation of powers, that the jurisdiction of the Court of Federal Claims, being statutorily limited by Congress, cannot be expanded by a court, a regulatory agency, a contract, or regulation. E.g., **Soriano v. United States**, 352 U.S. 270, 273 (1957); **Carney v. United States**, 462 F.2d 1142, 1144 (Ct. Cl. 1972). Additional Congressional limitations on the ambit of this jurisdiction, however, are binding, and "'must neither be disregarded nor evaded.'" **Keene Corp. v. United States**, 508 U.S. 200, 207 (1993) (quoting **Owen Equip. & Erection Co. v. Kroger**, 437 U.S. 365, 374 (1978)).

Contrary to plaintiffs' accusations, the jurisdiction afforded by the Tucker Act often has been limited by a later-enacted statute. See, e.g., **United States v. Fausto**, 484 U.S. 439, 454 (1988) (Civil Service Reform Act preempts court's jurisdiction to review agency's personnel decisions); **Brown v. General Servs. Admin.**, 425 U.S. 820, 829-33 (1976) (Title VII of Civil Rights Act of 1964 pre-empted court's jurisdiction over Federal employment discrimination claims). See also **Brown**, 425 U.S. at 834 ("a precisely drawn, detailed statute preempts more general remedies"). In sum, Congress can limit the court's jurisdiction as it sees fit.

Therefore, Section 119 deprives the court of any jurisdiction it may have had over contracts generally when the challenge is to a statutorily mandated provision of the Standard Contract,[4] such as the deadline in Section 302(a)(5)(B)

---

\4 The court does not analyze each provision of the Standard Contract to (continued...)

for accepting SNF. Because the court lacks jurisdiction over plaintiffs' claims regarding the disposal deadline, the court does not address whether defendant may invoke the Standard Contract's unavoidable delays provision.

Preclusive Effect of Other Circuit Court Decisions

Plaintiffs argue that the D.C. Circuit decisions in **Indiana Michigan**, **Northern States II**, and the Eleventh Circuit's decision in **Alabama Power**, 307 F.3d 1300 (11th Cir. 2002), are res judicata in this case and, therefore, that the court may not re-litigate questions conclusively decided in these cases.\5

The term "res judicata" often is used, generically, to encompass both issue preclusion (or collateral estoppel) and claim preclusion principles. See **Migra v. Warren City Sch. Dist. Bd. of Educ.**, 465 U.S. 75, 77 n.1 (1984). Here, plaintiffs appear to be relying on issue preclusion (collateral estoppel) in arguing that the court is barred from revisiting the issue of its jurisdiction.

"Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude re-litigation of the issue in

---

\4(...continued)
determine whether it is reviewable under Section 119. The court notes, however, that, because the entire Standard Contract was required by statute, see Section 302(a)(1), and it was promulgated pursuant to an APA on-the-record rule-making, see 48 Fed. Reg. 16,590 (April 18, 1983), the Federal Circuit's opinion in **City of Burbank**, 273 F.3d at 1380, would apply to bar any challenge to a Standard Contract provision in this court, and thus require the challenge to be filed in a Federal circuit court of appeals pursuant to Section 119.

\5 Only plaintiffs Florida Power and PSEG were parties (as intervenors) in the **Indiana Michigan** case. Only plaintiffs Florida Power and Duke Power were parties in **Alabama Power**. All four plaintiffs were parties to the **Northern States II** decision. In the OSC, the court erroneously stated that none of the plaintiffs were parties to the D.C. Circuit decisions because they were not listed as such in the published opinions.

a suit on a different cause of action involving a party to the first case." **Allen v. McCurry**, 449 U.S. 90, 94 (1980).

However, collateral estoppel applies to the parties in a litigation and does not necessarily bind the court. Moreover, the issue being jurisdictional, and this court alone having authority to determine its own jurisdiction, if necessary, sua sponte, the relevance of collateral estoppel principles is murky if not absent. See **Kontrick**, 540 U.S. 443, 124 S.Ct. at 915.

In any event, the court concludes that a decision as to whether Section 119 precludes plaintiff's breach of contract claims in this court was neither decided in, nor necessary to, the courts of appeals' judgments in the cases cited by plaintiffs.

In these D.C. Circuit cases, the utilities petitioned pursuant to Section 119 in a challenge to DOE's Notice of Inquiry and Final Notice on Waste Acceptance Issues, which concluded that DOE had no obligation, in the absence of an operational repository, to accept SNF by the disposal deadline. The D.C. Circuit vacated DOE's interpretation of the NWPA and held that the government's obligation was "unconditional" in light of the clear language in Section 302(a)(5)(B). The issue debated here, of whether the obligation was solely statutory or contractual, or a mixture of the two, did not arise.

Plaintiffs also challenge the court's questioning in the OSC of the D.C. Circuit's interpretation of the deadline in **Indiana Michigan**. Specifically, they challenge the court's statutory interpretation (1) that Section 302(a)(5)(A) did not in fact require DOE to take title to SNF until an operating repository was available; and (2) that the word "dispose" must be interpreted consistently with Section 2(9), which defines "disposal" as emplacement of SNF in a repository. Whether or not the this issue is precluded by the D.C. Circuit decisions, it was raised by the court in the interest of providing a general explanation as to why the Congress might or might not have ordered the statute as it did, not to decide the narrow question of the application of Section 302.

These arguments, however, do not address the court's interpretation of Section 119 that the circuit courts of appeals have exclusive jurisdiction to

entertain challenges to DOE's failure to take an action required by Title III of the Act. In fact, as plaintiffs readily admit, the D.C. Circuit's prior decisions were the result of petitions brought by the utilities pursuant to Section 119 challenging DOE's action regarding the disposal deadline in Title III.

The D.C. Circuit denied mandamus in these cases because the Standard Contract contains a fee adjustment provision for delayed performance, see Article IX(B) ("Avoidable Delays"), that "offers a potentially adequate remedy" for DOE's failure to dispose of SNF by the deadline. **Northern States II**, 128 F.3d at 761. This statement, however, cannot be interpreted as vesting the court with jurisdiction, see **United States v. Cook County, Illinois**, F.3d 1084, 1091-92 (Fed. Cir. 1999), and is not binding because the court has inherent authority to determine its own jurisdiction, see **Haines v. Merit Sys. Prot. Bd.**, 44 F.3d 998, 999 (Fed. Cir. 1995). Moreover, the D.C. Circuit was silent about Section 119's effect on this court's Tucker Act jurisdiction.

Plaintiffs also allege that Eleventh Circuit's decision in **Alabama Power** is res judicata on the issue of jurisdiction. Once again, plaintiffs cite a decision that supports the court's holding that the Federal courts of appeals are vested with exclusive jurisdiction over challenges to agency action or inaction under Section 302. In that case, the court held that a settlement agreement providing for the adjustment of one utility's fees pursuant to the delayed performance provision of the Standard Contract was tantamount to an unauthorized expenditure from the Nuclear Waste Fund ("Fund") pursuant to Section 302(d). **Id.**, 307 F.3d at 1312-13. The main jurisdictional issue raised was the government's argument that the petition was untimely pursuant to Section 119 because it was brought more than 180 days after the promulgation of the Standard Contract, which includes the delayed performance provision. The court disagreed and ruled that the petitioners were not challenging the validity of the Standard Contract provision but rather the improper expenditure of Fund monies that stemmed from the fee adjustment. **Id.** at 1311. Accordingly, the Eleventh Circuit expressly asserted jurisdiction under Section 119 over an agency action made pursuant to Section 302.

Even if the prior decisions of the D.C. and Eleventh Circuits directly addressed the issue of whether Section 119 limits the court's Tucker Act

jurisdiction, they would still have no preclusive effect. "Consent alone gives jurisdiction to adjudge against a sovereign." **Christopher Village, L.P. v. United States**, 360 F.3d 1319, 1331 (Fed. Cir. 2004). Therefore, the doctrine of sovereign immunity will override the res judicata effect of a prior decision if the "issuing court's lack of jurisdiction 'directly implicat[es] issues of sovereign immunity.'" **Id.** at 1332 (quoting **Int'l Air Response v. United States**, 324 F.3d 1376, 1380 (Fed. Cir. 2003)). The D.C. and Eleventh Circuits lack jurisdiction over contract claims against the government for money damages, and their decisions on this court's Tucker Act jurisdiction will necessarily involve issues of sovereign immunity, and, thus, will not have preclusive effect.

Consequently, none of the prior decisions cited by plaintiffs may constitute res judicata because they do not address the jurisdictional issues raised by this opinion with respect to section 119, and even if they did, would not have preclusive effect since they would implicate issues of sovereign immunity.

Preclusive Effect of Federal Circuit Decisions

Plaintiffs also argue that the court must adhere to the Federal Circuit's holding, in **Maine Yankee Atomic Power Co. v. United States**, 225 F.3d 1336 (2000), and **Northern States Power Co. v. United States**, 224 F.3d 1361 (2000) ("**Northern States III**") (decided simultaneously), that the Standard Contract may be enforced by the Court of Federal Claims pursuant to its Tucker Act jurisdiction.

The only issue directly resolved by the Federal Circuit in **Maine Yankee** and **Northern States III** was whether the plaintiff utilities were required to exhaust the administrative remedies provided by the Standard Contract before filing suit for breach of contract in the Court of Federal Claims. The government argued that the failure to meet the disposal deadline was an avoidable delay for which the Standard Contract provided a remedy, and, thus, pursuant to the contract's dispute clause, the plaintiff utilities were required to file an administrative claim before bringing suit in the Court of Federal Claims. See **Maine Yankee**, 225 F.3d at 1339. The government relied on the D.C. Circuit's decision in **Northern States II**, which had denied the utilities' mandamus

petition because a potentially adequate remedy was available under the Standard Contract.

The Federal Circuit instead held that the unavoidable delay provision applied only to delays occurring post-performance (i.e., delays in the "delivery, acceptance or transport of [SNF]"). **Maine Yankee**, 225 F.3d at 1341. The court noted that the breach of contract claim (identical to plaintiffs' claim here) "is far broader than one for improper delays by [DOE] in performing its contractual obligations;" thus, the delay clause could not be "properly read to cover [that] claim," **id.** at 1341-42, and the utilities did not have to exhaust their administrative remedies before suing for breach of contract in this court. The court also affirmed the grant of partial summary judgment for breach of contract based on DOE's failure to meet the January 31, 1998 disposal deadline.

There was no discussion in either case, however, of the jurisdictional issues raised by the statutory judicial review provision that is the subject of this opinion. As discussed extensively in the OSC, the court is not bound by previous exercises of jurisdiction if the power to act was not in question, but only passed "sub silentio." **Brown Shoe Co. v. United States**, 370 U.S. 294, 307 (1962). Accordingly, these cases are not binding precedent with respect to the court's jurisdiction subject to Section 119 of the NWPA.

Judicial estoppel.

Plaintiffs also argue that defendant should be judicially estopped from holding that the appeals courts have jurisdiction over Standard Contract claims. See **New Hampshire v. Maine**, 532 U.S. 742, 749 (2001) (judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase"). Defendant's prior positions in related litigation are irrelevant because the court raised the issue of jurisdiction, sua sponte, and neither defendant's nor any other party's statements or legal positions, even before this court in this case may not bestow subject matter jurisdiction on this court. See, e.g., **Soriano**, 352 U.S. at 273 (1957) (Court of Federal Claims is a court of limited statutory jurisdiction, which cannot be expanded beyond the bounds established by Congress).

## **CONCLUSION**

For the reasons discussed above and in the OSC, this court lacks jurisdiction over plaintiffs' breach of contract claims.

This court may transfer a case "to any other court in which the action or appeal could have been brought at the time it was filed or noticed." 28 U.S.C. § 1631. These transfer decisions are discretionary. See **LeBlanc v. United States**, 50 F.3d 1025, 1031 (Fed. Cir. 1995). The court is not aware of any reason to doubt that a transfer to the United States Court of Appeals for the District of Columbia Circuit would be permitted, but has discovered no case discussing such a transfer.

Accordingly, plaintiffs Florida Power and Duke Power's breach of contract claims are transferred to the D.C. Circuit because they were filed within 180 days of the standard contract's January 31, 1998 disposal deadline, and thus were timely pursuant to Section 119.

Plaintiffs Nebraska Power and PSEG's breach of contract claims, however, cannot be transferred because they were filed in 2001 and, thus, could not have been filed in the D.C. Circuit at the time they were filed in this court. Therefore, Nebraska Power and PSEG's breach of contract claims are dismissed.

A final transfer decision may be appealed to the Federal Circuit under 28 U.S.C. § 1295(a)(3). Alternatively, the claims court may seek an interlocutory decision by the appellate court, pursuant to 28 U.S.C. § 1292(c)(1), if it certifies "a controlling question of law . . . with respect to which there is a substantial ground for difference of opinion" and that an immediate appeal from that order "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(d). District courts may certify interlocutory orders under a similar procedure. See 28 U.S.C. § 1292(b).

Unlike when a district court's grant or denial of a motion to transfer to this court is appealed, the proceedings before this court are not automatically stayed pending decision by the Federal Circuit on a certified question, even if the

question regards a transfer. Compare 28 U.S.C. § 1292(d)(4)(B) (when a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the [district] court has ruled upon the motion) with 28 U.S.C. § 1292(d)(3) (granting stay pending appeal of certified question is within discretion of the court).

This opinion raises "a controlling question of law . . . with respect to which there is a substantial ground for difference of opinion" and that an immediate appeal from this opinion "may materially advance the ultimate termination" of the litigation." 28 U.S.C. § 1292(d). The jurisdictional issues raised in this opinion could resolve the more than 65 cases alleging breach of the Standard Contract for the government's failure to accept civilian SNF by the disposal deadline now pending before the court. Therefore, consistent with the plaintiffs' guidance in their responses to the October 14, 2004 show cause order, the court certifies this opinion so that the parties may bring an interlocutory appeal to the Federal Circuit, pursuant to 28 U.S.C. § 1292(c)(1).

Plaintiffs' remaining claims are STAYED pending resolution of the jurisdictional issues raised in this opinion on appeal.

s/ Diane Gilbert Sypolt
DIANE GILBERT SYPOLT
Judge, U.S. Court of Federal Claims

# ORDER TO SHOW CAUSE AND FOR ADDITIONAL BRIEFING

Plaintiffs, the Florida Power and Light Company ("Florida Power"), Duke Power ("Duke Power"), the Nebraska Public Power District ("Nebraska Power") and PSEG Nuclear, L.L.C. ("PSEG") are among 65 civilian title-owners or generators of nuclear waste ("utilities") and other interested parties that have sued defendant, the U.S. Department of Energy ("DOE"), alleging that DOE breached a "Standard Contract" to begin disposing of their nuclear waste in a permanent deep geologic system ("repository") before a January 31, 1998 deadline ("disposal deadline") established in the Nuclear Waste Policy Act of 1982 ("NWPA" or "Act").[\1] See Section 302(a)(5)(B).[\2]

The court is bound to raise and decide, sua sponte, as a threshold matter, the existence of subject-matter jurisdiction, see **Kontrick v. Ryan**, 540 U.S. 443, 124 S.Ct. 906, 915 (2004) (citing **Mansfield, C. & L.M. Ry. Co. v. Swan**, 111 U.S. 378, 382 (1884) (challenge to a federal court's subject-matter jurisdiction may be made at any stage of the proceedings and the court should raise the question sua sponte)), **Arctic Corner, Inc. v. United States**, 845 F.2d 999, 1000 (Fed. Cir. 1988) ("A court may and should raise the question of its jurisdiction sua sponte at any time it appears in doubt").

---

\1 See Pub. L. No. 97-425, 96 Stat. 2201-2263, codified at 42 U.S.C. §§ 10101-10126 (January 7, 1983). Section references throughout are to the NWPA.

\2 Section 302(a)(5) provides that (emphases added):

> "(A) following commencement of operation of a repository, the Secretary shall take title of the [SNF] involved as expeditiously as practicable upon the request of the generator or owner such [SNF],"); and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the [SNF] as provided in this sub-title."

Plaintiffs bear the burden of establishing federal jurisdiction. See **Steel Co. v. Citizens for a Better Env't**, 523 U.S. 83, 104 (1998); **Warth v. Seldin**, 422 U.S. 490, 518 (1975); **McNutt v. Gen. Motors Acceptance Corp.**, 298 U.S. 178, 189 (1936); **Alder Terrace, Inc. v. United States**, 161 F.3d 1372, 1377 (Fed. Cir. 1998).

Plaintiffs therefore shall show cause, on or before November 12, 2004, why, for the reasons raised or discussed below, their complaints should not be dismissed for lack of subject-matter jurisdiction.

## I. INTRODUCTION

As damages for DOE's breach of the disposal deadline, plaintiffs claim entitlement to the costs of storing spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW") (collectively, "SNF," or "nuclear waste") at their eight reactor sites after January 31, 1998. They also seek compensation for a taking of property in violation of their Fifth Amendment rights. Florida Power's June 8, 1998, complaint demands damages of over $300 million; Duke Power seeks over $ 1 billion in damages; and Nebraska Power and PSEG each claim amounts to be determined at trial.\3

---

\3 Industry representatives have estimated that the damage claims in this court may exceed $50 billion. See Nuclear Waste Policy Act of 1999: Hearing on H.R. 45 Before Subcomm. on Energy and Power of House Committee on Commerce, 106th Cong. 108, 223 (1999) (Statement of David W. Joos, CEO of Consumers Energy, for the Nuclear Energy Institute). The government estimates its exposure as approximately $2 billion. See GENERAL ACCOUNTING OFFICE, NUCLEAR WASTE: TECHNICAL, SCHEDULE, AND COST UNCERTAINTIES OF THE YUCCA MOUNTAIN REPOSITORY PROJECT ("GAO Report") at 2 (2001). At the end of Fiscal Year 2002, the balance for the civilian portion of the Nuclear Waste Fund was $13.4 billion, and the utilities owed an additional $3 billion in fees. See OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT ("OCRWM"), 2002 ANN. REP. 41, 43. Thus, payment of the damages estimated to be due to the
(continued...)

Commercial nuclear waste in this country currently is stored, on-site, at 72 power plants and two small central storage facilities.[\4] A few of the sites, such as the Yankee Rowe, Maine Yankee, and Haddam Neck sites, no longer support operating reactors. See **Yankee Atomic Elec. Co. v. United States**, No. 98-126 (Fed. Cl. filed Feb. 18, 1998)

In the NWPA, Congress directed DOE to enter into contracts with the utilities for the "acceptance of title, subsequent transportation, and disposal" of SNF. The contracts were required "to provide for the payment to the Secretary of fees . . . . sufficient to offset expenditures" of building a repository for disposing of SNF (originally two were contemplated). DOE was required to "begin to dispose of" the utilities' SNF by January 31, 1998. See Section 302(a)(5)(B). Two categories of fees, both based on electrical production, but at different per-kilowatt-hour rates, are authorized. One is based on pre-Act production, see Section 302(a)(2); the other on post-Act production, see Section 302(a)(3). Both must be deposited into the nuclear waste fund ("Fund") established by Section 302(c).

DOE published the contract authorized by Section 302(a)(1), which it termed a "Standard Contract" for public comment, in accordance with the procedures established in the Administrative Procedures Act ("APA") for substantive rule makings requiring "notice, hearing, and comment." See 5 U.S.C. § 553.

The Act and the Standard Contract do not mention the two terms at issue in this case—a minimum SNF acceptance rate, or the imposition of penalties for DOE's failure to meet the January 31, 1998 deadline. That is because DOE explicitly rejected, including in the final rule, repeated requests from the utilities

---

\3(...continued)
nuclear utilities from the Fund might well bankrupt the Fund.

\4 See CONGRESSIONAL RESEARCH SERVICE, ISSUE BRIEF: CIVILIAN NUCLEAR WASTE DISPOSAL 6 (updated 2003); OCRWM, TOTAL SYSTEM DESCRIPTION, Revision 2, 11 (2001).

and their trade groups, during and even before the public rule-making, that these terms (including penalties in the form of storage costs) be included.[\5]

Given the dire consequences for a utility refusing to sign, the Act "effectively made entry into such [standard] contracts mandatory."[\6] See **Maine Yankee Atomic Power Co. v. United States**, 225 F.3d 1336, 1337 (Fed. Cir. 2000) (citing Section 302(b)(1)(A) ("Advance Contracting Requirement")). Unsurprisingly, all of the utilities signed the contract before the six-month post-Act deadline expired.

In a Notice published for comment on May 25, 1994,[\7] and made final on May 3, 1995,[\8] but subsequently vacated by the D.C. Circuit,[\9] DOE announced that neither a monitored retrievable storage ("MRS") facility nor a repository would be available by January 31, 1998, and that the acceptance of waste for disposal at a repository would not begin before 2010.

---

\5 See Appendix to Defendant's Motion for Partial Summary Judgment on Rate of Acceptance ("App., Def.'s MPSJ/Rate") at 1-120.

\6 The adverse consequences of a utility not signing a contract included an absolute bar on disposing of its SNF in the repository, see Section 302(b)(2), and possible Nuclear Regulatory Commission ("NRC" or "Commission") denial of the issuance or renewal of an operating license. See Section 302(b)(1)(B).

\7 See 59 Fed. Reg. 27,007 (May 25, 1994) ("Notice of Inquiry: Waste Acceptance Issues").

\8 See 60 Fed. Reg. 21,793 (May 3, 1995) ("Final Interpretation of Nuclear Waste Acceptance Issues").

\9 See **Indiana Michigan Power Co. v. DOE**, 88 F.3d 1272, 1277 (D.C. Cir. 1996).

## II. PENDING MOTIONS

The following motions are before the court:

### A. Greater than Class C Waste

Defendant has moved for partial summary judgment that Greater than Class C ("GTCC") waste is not covered by the Standard Contract.

Plaintiffs deny both that they have asserted such a claim and that they currently store such waste at their reactor sites.[\10] Plaintiffs' amended complaint does not mention GTCC waste, only SNF, and there is no evidence that plaintiffs ever requested DOE to dispose of it. Defendant concedes these points.

Plaintiffs urge denial of the GTCC motion for lack of a case or controversy; because it requests an advisory opinion or declaratory judgment, neither of which this court may issue; and because it is not ripe. These bars to jurisdiction are recognized by this court. See, e.g., **United Pub. Workers v. Mitchell**, 330 U.S. 75, 89 (1947); **Hayburn's Case**, 2 Dall. (2 U.S.) 409 (1792); **Abbott Labs. v. Gardner**, 387 U.S. 136, 148-49 (1967) .

Defendant states that many plaintiff utilities, in their interrogatory responses, asserted that the NRC had determined that GTCC waste constituted HLW. Defendant denies these assertions, and expressly declares, instead, that GTCC waste is not HLW. Defendant claims that the GTCC issue is ripe for judicial review as "purely legal," and that withholding a decision would cause "hardship" because the government must know whether it is obligated to accept GTCC when planning a proper waste acceptance schedule.

---

\10 In response to defendant's interrogatories, plaintiffs Florida Power and Duke indicated that decommissioning of their nuclear reactors will generate GTCC waste.

Given the procedural uncertainties attending the jurisdictional issues raised by this order, the court STAYS decision on defendant's GTCC motion until it has considered the responses to this show cause order.

## B. Takings Claim

Defendant has moved to dismiss plaintiffs' Fifth Amendment compensation claims for failure to state a claim upon which relief can be granted, arguing that plaintiffs may not maintain takings claims while they are pursuing breach of contract claims.

Plaintiffs do not identify clearly the property interests alleged to have been taken by the DOE's failure to dispose of its SNF, or a coherent basis for distinguishing such interests from those subject to their breach of contract claim. Cf. **Conley v. Gibson**, 355 U.S. 41, 47 (1957) (complaint must give either "fair notice" of what plaintiff's taking claim is, or "the grounds upon which it rests"). Although "'interference with rights voluntarily created by contract generally gives rise to a breach of contract, not a taking[s], claim,'" see **Detroit Edison Co. v. United States**, 56 Fed. Cl. 299, 302-03 (2003) (quoting **Hughes Communications Galaxy, Inc. v. United States**, 271 F.3d 1060, 1070 (Fed. Cir. 2001)), it is not entirely clear to the court which interests are being claimed as property rights and how the government actions at issue here affected them.

Given their amorphous quality, the court also STAYS decision on the takings claims until it has decided the jurisdictional issues raised in this order.

## C. Post-1998 SNF Acceptance Rate

Defendant has moved for partial summary judgment that the correct rate of acceptance for determining damages for breach of the disposal deadline, is the rate established by DOE in accordance with the acceptance approval procedures that are mandated by Section 302(a)(6) of the Standard Contract ("The Secretary shall establish in writing criteria setting forth the terms and conditions under which such disposal services shall be made available.")

Invoking the doctrine of contra proferentum \11 (which holds that latent contract ambiguities must be construed against the drafter), plaintiffs argue that the acceptance rate is a "missing or omitted term" justifying the court's supplying or imposing an extra-contractual "reasonable" rate, apparently without regard to: (1) the parol evidence rule, (2) the inclusion in the contract of an integration clause, or (3) the contemporaneous written (and published) evidence that DOE did not intend, but rather refuted, expressly, the idea of including any particular acceptance rate in the Standard Contract, or prescribing damages for missing the 1998 deadline. See App., Def.'s MPSJ/Rate at 1-120.

Plaintiffs request that the contract be reformed to provide an allegedly "reasonable" post-1998 annual industry-wide acceptance rate of 3,000 metric tons of uranium ("MTUs") per annum, based on (1) legislative history suggesting an intent to dispose of enough SNF to eliminate the backlog of waste already stored on-site and (2) an informal goal or guideline of 3,000 MTUs, which apparently was used by certain DOE staff for planning purposes, to calculate disposal of all SNF generated by 2020, under the following assumptions: (1) that 130,000 MTUs of SNF remained to be disposed of; (2) that a second repository would be available in 2006; and (3) that all such SNF would be disposed of by 2031. See App., Def.'s MPSJ/Rate at 198, 201-02 (1985 Mission Plan for the Civilian Radioactive Waste Management Program).\12

---

\11 The nuclear industry's unusually active participation in the drafting process, see Amended Supplemental App., Def.'s MPSJ/Rate at 612, 613, 622-65, appears to supply the negotiation that ordinarily is deemed to be lacking for purposes of imposing the rule of contra proferentum. See **Commonwealth Edison Co.**, 88-2 BCA ¶ 20,711 (February 25, 1988) (citing **Tulelake Irrigation District v. United States**, 342 F.2d 447( Ct. Cl. 1965)).

\12 Plaintiffs appear to provide no objective basis for this reformation, relying instead on equitable principles and a widely-shared impression, among jurists and others, that the agency should be punished for transgressing against public safety. None of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was (continued...)

Defendant, on the other hand, argues that the acceptance rate must reflect only those amounts and times that DOE actually approved, in accordance with the Standard Contract's detailed, statutorily-required acceptance procedures, and published at 10 C.F.R. § 961.11 ("Standard Contract"), Article VI ("Criteria for Disposal").

Under the Standard Contract's disposal criteria, each utility wishing disposal services was required to submit annually a delivery commitment schedule ("DCS"), requesting the amounts it wished DOE to accept, for ten years, from 1998 to 2007 (the anticipated date when interim storage would become available). The DCSs were based on DOE's Annual Capacity Reports ("ACRs"), which assumed that no repository would become available before 2007 and that the capacity of the interim repository would be limited to 10,000 MTUs of MRS, as the 1987 amendments to the Act required.[\13] See App. Def.'s MPSJ/Rate at 223.

Notwithstanding its objections to plaintiffs' use of an extra-contractual rate, defendant, in the alternative, also advances such a rate. The government's rate is based on the ACRs. DOE claims that it intended an initial rate of 400 MTUs, which would "ramp up" to 900 MTUs in the third year of waste disposal. App.,

---

\12(...continued)
made clear to all during contract negotiations. See **Am. Telephone and Telegraph Company v. United States**, 307 F.3d 1374, 1381 (Fed. Cir. 2002), reh'g en banc denied (Jan. 27, 2003) ("The purpose and function of the reformation of a contract is to make it reflect the true agreement of the parties on which there was a meeting of the minds." (quoting **Am. President Lines, Ltd. v. United States**, 821 F.2d 1571, 1582 (Fed. Cir. 1987))).

\13 Congress authorized the development of temporary monitored retrievable storage ("MRS") facilities in the Nuclear Waste Policy Amendments of 1987. See Pub. L. No. 100-203, 101 Stat. 1330. However, the MRS' capacity was limited to 10,000 MTUs, in the expressed interest of ensuring that the MRS would not substitute for, or steal momentum from, the development of a permanent repository. See 42 U.S.C. § 10168(d)(3).

Def.'s MPSJ/Rate at 223, 234, 238-39 (1991, 1992, and 1995 ACRs). Defendant argues that each plaintiff's measure of recovery should be limited to the costs of storage for the amounts of SNF in their respective DCSs that were approved by DOE.

D. Jurisdiction

Interesting though these acceptance rate and breach of contract arguments may be, however, the court may not reach their merits if it lacks subject-matter jurisdiction over plaintiffs' claims. See **Steel Co.**, 523 U.S. at 94; see also **Nippon Steel Corp. v. United States**, 219 F.3d 1348, 1352 (Fed. Cir. 2000). It appears to this court, for many internally-reinforcing reasons, that subject-matter jurisdiction over plaintiffs' present challenge to DOE's actions properly lies elsewhere.

The principal reason for this conclusion, which is elaborated within, is that Congress intended Section 119 of the Act to impart original and exclusive jurisdiction to entertain challenges to the Secretary's action or failure to take an action required by Title III of the Act to the appropriate U.S. Circuit Courts of Appeals (or the D.C. Circuit). The D.C. Circuit, which was the first court to hear a challenge to the Act, so held in 1985, see **Gen. Elec. Uranium Mgmt. Corp. v. DOE**, 764 F.2d 896 (D.C.Cir. 1985), and, with one notable exception, see **Wisconsin Elec. Power Co. v. DOE**, 211 F.3d 646 (D.C. Cir. 2000) ("**Wisconsin Electric II**"), has continued so to hold.

On its face, Section 119 does not appear to encompass challenges to DOE actions under Title III of the Act, or, what is of greatest interest here, to Section 302(a)(5) thereunder. However, a literal reading of the errors and ambiguities in Title III and the anomalous lack of any jurisdictional forum or procedures for challenging Title III actions, create a result so unlikely as to justify resort to the legislative history.

The overall structure and purposes of the statute, its text, and the legislative history indicate that the failure to carry over the Section 119 reference when Section 302 was moved from Title I, Subtitle A, to a newly-created title III,

during the legislative drafting process, was due to an inadvertent drafting mistake or oversight. It appears obvious that a literal reading of Section 119, which would result in the bifurcation of review between a trial and appellate court, would sorely frustrate the purposes of the Act, by retarding resolution of disputes and thus delaying completion of the repository. Moreover, although the Act clearly contemplates a "contract," it just as clearly did not provide for review of that contract in the usual forum, the Court of Federal Claims.

The court therefore, as further discussed below, concludes that plaintiffs' claims, that DOE did not comply with the Standard Contract under Title III, or with Section 302, or, more particularly, with the deadline for SNF disposal in Section 302(a)(5)(B), must be brought in a Federal court of appeals, regardless of whether damages are sought for the breach.

Another reason it appears improbable that Congress would have intended to place these claims under this court's Tucker Act contract jurisdiction is that, notwithstanding its label, the "Standard Contract," is simply, as a matter of logic and under usual definitions of a contract, a regulation. See **Commonwealth Edison Co. v. DOE**, 877 F.2d 1042, 1045 (D.C. Cir. 1989) ("the mere appearance of a standard form in the Code of Federal Regulations does not perforce eliminate its identity as a contract. . . .we find that the Standard Contract . . . should be viewed as a regulation. [The specification in the Act of contracts for the payment of fees] is a matter of form rather than content."). As such, the agency's breach is remediable, either by a circuit court of appeals, or the legislature. This may be inferred both from the means by which the utilities entered into the Standard Contract (under threat of losing repository use, and an NRC license), and the manner in which it was promulgated (as a public rule-making). It also is evidenced by the absence of virtually any essential element of an enforceable government contract (meeting of the minds, consideration, authorization by Congress, etc.). The contract element most glaring in its absence here is Congress' contractual intent, which is particularly significant in government contract cases, in which the government's intent to be bound must be clear. DOE refused to enter into a contract setting an acceptance rate, or for storage cost damages, and it appears inconceivable that Congress would have done so, for the reasons discussed infra.

Finally, the court's painstaking review of the Act and its legislative history reveals no suggestion that Congress or DOE intended, foresaw, or could have foreseen (as would be necessary to impose on either a contractual obligation to pay the breach damages requested here) that missing the 1998 deadline in Section 302(a)(5) would subject the government to such damages.

Rather, Congress was well-aware, given the overly-ambitious milestones for site characterization and approval, NRC licensing, and the novelty of the undertaking, of the substantial likelihood that DOE would miss a 1998 deadline to begin accepting SNF. It also is highly unlikely (and there is no contrary evidence in the legislative history) that Congress (or DOE) intended that such a failure would entitle the utilities to storage costs in an amount so large as to endanger the central purpose of the Act, particularly when there was no urgent safety reason to emplace the SNF, since continued on-site storage, even for several decades, was not viewed as particularly risky at the time the Act was passed.

Finally, and crucially, no storage cost damages of the type sought here could conceivably have been anticipated by Congress, or the DOE, because Section 302(a)(5) clearly, twice, conditions DOE's obligation to begin to dispose of SNF by the deadline on the existence of an <u>operational</u> repository, ready for <u>emplacement</u> of SNF.

On this point, this court respectfully disagrees with the interpretation given to Section 302(a)(5) by the D.C. Circuit in **<u>Indiana Michigan Power Co. v. DOE</u>**, 88 F.3d 1272, 1275-77 (D.C. Cir. 1996), which held that breach of the looming disposal deadline was not conditioned upon the existence of an operational repository capable of emplacing SNF.

The logical order of the actions described in subparagraphs (A) and (B) of Section 302(a)(5), in the opinion of this court, unfolds in five chronological steps. Under Section 302(a)(5)(A): 1) a repository commences operations, 2) a utility requests removal of SNF, and 3) the government takes title to the SNF identified by the utility. Then, under Section 302(a)(5)(B): 4) the utility pays all fees due,

and 5) disposal (emplacement in a repository) of the utility's SNF begins, not later than January 31, 1998.

The court in **Indiana Michigan** concluded that the explanation advanced by DOE and this court would write out of the statute the deadline date. However, that would occur only when, as here, construction of the repository lagged significantly behind schedule—more than ten years behind in 1998. Had the repository been completed and become operational on schedule, or even approximately on schedule, the 1998 date would have served simply as a direction that DOE to begin emplacing SNF by then.

The D.C. Circuit also reasoned that an operational repository was unnecessary before acceptance could begin because subpar. (A) deals only with title to SNF, and is independent of subpar. (B), which conditions the obligation to accept SNF on DOE's ability to "dispose of" it. The circuit court decided that "dispose of" did not mean "emplacement in a repository" (as "disposal" is defined in the Act) since it was not separately defined in the Act and had a different dictionary definition.

This court, again, respectfully disagrees. Both of these terms are used extensively, and interchangeably, throughout the statute, and have the same meaning. See, e.g., Section 302(a)(6); Section 302(b)(1)(B), (b)(2), and (b)(4) (two terms describe similar situations), and, e.g., Section 111(b)(1)( "disposed of" consistently paired with qualifier "in a repository." Moreover, under common dictionary usage, "disposal" is the "base word"of a family of words, including "dispose," which is merely the verb form of the noun "disposal." See MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 15a, 335 (10th ed. 2001) (Explanatory Notes; definition of "disposal" and "dispose").

## III. BACKGROUND

The following summarizes technical and historical information regarding the purposes and operation of the NWPA and of the Standard Contract. The information derives primarily from the legislative history of the Act; reports by the principal agencies involved in administering the Act—DOE, NRC, and the

General Accounting Office ("GAO"); and the administrative record of the 1983 rule-making, as set out in the parties' appendices. The court also occasionally refers to public information disseminated by recognized experts in the field of nuclear waste.

The jurisdictional determination, nevertheless, depends primarily on the court's legal analysis of the NWPA, the Act's legislative history, the regulation and rule-making, case law, and other customary legal sources.

A. Technology

To accomplish nuclear generation of electrical power, 12-14 foot metal rods containing uranium oxide pellets are bundled into "assemblies," of about 1 MTU each, and placed in a nuclear reactor core, where the heat produced through fission is converted to steam to drive turbines that generate electricity.

Within 12 to 18 months, the uranium becomes inefficient, the reactor is shut down, and the old assemblies containing SNF are removed and, most frequently, placed, on-site, into so-called "wet" basins of water, or pools, typically 80 by 40 feet, where the SNF must cool for at least five years.

The volume of SNF is surprisingly small, due to its great density. Thus, the entire amount of nuclear waste ever produced in this country may be stored on a single football field, fifteen feet deep. See OCRWM, FACT SHEET: WHAT ARE SPENT NUCLEAR FUEL AND HIGH-LEVEL RADIOACTIVE WASTE? (2003).

Through re-racking and consolidation, the original capacity of the pools has more than doubled. DOE, FINAL VERSION DRY CASK STORAGE STUDY/RW-0220 ("Dry Cask Storage Study") I-4 (1989). However, there are technical limitations on adding new pools at some sites. See H.R. REP. NO. 97-785 ("Report on H.R. 6598"), pt. 1, at 41 (1982).

Increasingly, since even before passage of the Act, dry-cask storage has been used. Id. "Dry-casks have the advantage of providing storage capacity on a modular basis[;] [l]arge construction expenditures will not be necessary;" and

"their safety has been demonstrated." Id. Currently, 18 reactors use dry cask storage, and 14 more plan to. See Mike Adams, Radioactive Wastes: The Risks on the Rails, BALT. SUN, Feb. 11, 2002, at A1 (comments of Mitch Berger, spokesman for the Nuclear Energy Institute).

A typical dry-cask, 18 feet in length and 8-9 feet in diameter, can store up to 25 MTUs (slightly more than the average reactor's annual SNF output) and costs between $500 thousand and $1 million. See Dry Cask Storage Study at I-50, 51; NUCLEAR ENERGY INSTITUTE, USED NUCLEAR FUEL: HANDLED WITH CARE 4 (1999).

A "pad" the size of a football field can hold up to 72 casks, or almost a full year of the entire industry's SNF production. See Matthew L. Wald, New Focus on Old Nuclear Problem, N.Y. TIMES, June 4, 2001, at A14. One reactor site, which covers at least several acres, thus would have ample storage space for the reactor's lifetime SNF output.

The nation's 103 commercial nuclear power plants, which provide about 20% of U.S. electrical generating capacity, annually discharge approximately 2,000 MTUs of waste. See CONGRESSIONAL RESEARCH SERVICE, ISSUE BRIEF FOR CONGRESS: CIVILIAN NUCLEAR WASTE DISPOSAL 6 (updated 2003). By 1998, over 36,700 MTUs of SNF had been produced. See ENERGY INFORMATION ADMINISTRATION, FORM RW-859: NUCLEAR FUEL DATA (1998). By late 2002, 45,000 MTUs were stored on-site. The total by the end of 2010 is estimated at 62,000 MTUs. By 2042, when these plants are to be decommissioned, SNF accumulation should total between 86,000 and 105,000 MTUs, if license renewals continue at their current pace.\14 See OCRWM, SPENT FUEL STORAGE REQUIREMENTS 1994-2042 2.3, 4.4 (1995); OCRWM, 2001 ANN. REP. C-1.

---

\14 License renewal applications have been submitted for more than half of the nation's operating civilian nuclear reactors. See XCEL ENERGY, 2002 RESOURCE PLAN 82.

The SNF expected to be generated through the planned 2010 repository completion date will almost equal the planned 63,000 MTU[\15] capacity of the proposed Yucca Mountain repository.

At the 3,000 MTU-per-year acceptance rate, as justified by the utilities (consisting theoretically of 2,000 MTUs per-year of currently-generated SNF, plus 1,000 MTUs per year of the backlog), it would take over 36 years to dispose of the 36,700 MTUs stored on-site as of January, 1998.[\16] Had disposal begun in January 1998, by 2019, 21 years later, 42,000 MTUs of the annual SNF production at the 2,000 per annum rate would have been disposed of, but only 21,000 MTUs of the "backlog." This would exhaust the 63,000-MTU capacity of the repository and leave over 15,700 MTUs stored on-site. Unless another repository is built before 2019, which seems unlikely, Yucca Mountain not yet being licensed, and no site selection for another repository having commenced, even if DOE had begun to dispose of SNF at plaintiff's desired acceptance rate beginning in January 31, 1998, some quantity of SNF would remain at the reactor sites for the foreseeable future.

The authorization of research and incentives to increase on-site storage, such as re-racking and dry cask use, in Title II of the Act, see Section 218(a), suggests that Congress may have been aware that some amount of SNF might remain on-site after repository completion. Congress indisputably understood this likelihood when enacting the 1987 Amendments to the NWPA, which rescinded DOE's authority to develop additional repositories and permitted only

---

\15 By statute, the repository capacity is limited to 70,000 MTUs. See 42 U.S.C. § 10134(d). However, 7,000 MTUs have been reserved for government-produced nuclear waste. See OCWRM 2001 ANN. REP. C-1.

\16 Despite the implication of plaintiffs' acceptance rate arguments, the 2,000 MTUs in annually-generated SNF cannot be taken each year, and will not actually diminish the current SNF production as it must remain in cooling pools for at least five years after removal from the reactor. See Dry Cask Storage Study I-96, 97 (SNF stored in dry-cask emit acceptable radiation doses after being cooled in a pool for at least five years).

up to 10,000 MTUs of storage in MRS facilities. See 42 U.S.C. §§ 10168(d), 10172a. Fortunately, it appears that the utilities, up until now, have developed sufficient additional on-site storage capacity to meet their needs: no reactor has been shut down for lack of storage, and no utility has requested DOE to provide the interim off-site storage capacity authorized by Section 135 (up to 1,900 MTUs of storage capacity, either in a Federal facility, mobile cask, or similar equipment, or on-site, in storage constructed by DOE).

## B. History of the Nuclear Waste Policy Act

When the first nuclear power plants began to operate in the late 1950's, re-processing was expected both to eliminate storage and disposal problems and to offset any associated expense. See SEN. REP. NO. 96-548 ("Report on S. 2189") at 13 (1980). By the mid-seventies, however, it become clear that re-processing would not be "a viable industry" in the United States. H.R. REP. NO. 97-491 ("Report on H.R. 3809"), pt. 1, at 2 (1982), reprinted in 1982 U.S.C.C.A.N. 3792. Nuclear utilities began to complain that their plants would run out of storage space. In the wake of incidents such as the allegedly nearly-disastrous errors at Three-Mile Island, the public, too, expressed qualms about long-term storage. See Report on S. 2189 at 10.

Concerned that increasingly negative public opinion might imperil the very survival of the nuclear industry, Congress in the late 1970's began to consider legislation to deal with nuclear waste disposal.[\17] After several false starts, see, e.g., S. 1119, 96th Cong. (1979), S. 2189, 96th Cong. (1980), H.R. 7418, 96th Cong. (1980), the NWPA was enacted in 1983.

---

\17 Dr. Victor Gilinsky, a former NRC commissioner under both President Ford and President Carter, recently testified that the post-1975 move to the permanent geologic repository concept "was done, not to protect public safety in the distant future, but to protect the licensing of nuclear plants against then-ongoing court challenges by environmental activists and other opponents." Yucca Mountain Repository Development: Hearing on S.J. Res. 34 Before Senate Comm. on Energy and Natural Resources, 107th Cong. 75 (2002).

The principal purposes of the Act, and those relevant to this order are:

1. To recommend, characterize, and obtain approvals for repository sites from several Federal agencies, the state Governor, neighboring Indian tribes, Congress and the President, and to build two repositories. See Subtitle A ("Repositories for Disposal of High-Level Radioactive Waste and Spent Nuclear Fuel") of Title I ("Disposal and Storage of [SNF]").

2. To encourage the effective use of storage, on-site and, as necessary, at interim facilities, of up to 1,900 MTUs of SNF. See Title I, Subtitle B ("Interim Storage Program").

3. To prepare a draft "Mission Plan" for Congress, reporting extensive scientific, engineering, financial, political, and institutional information, including repository capacity. See Title III ("Other Provisions Related to Nuclear Waste"), Section 301.

4. To enter into contracts with utilities, see Section 302(a)(1), providing that, "following commencement of operation of a repository," DOE would take title to and "begin to dispose of" their SNF, "in return for" fees required to "offset repository construction costs," beginning not later than January 31, 1998. See Section 302(a)(5) (emphasis added).

5. To set utility fees, to be paid into a Nuclear Waste Fund ("Fund") established to underwrite "radioactive waste disposal activities." Sections 302(a)(2)-(4),(c),(d).

C. On-site Storage Risks

Nuclear waste indisputably is extremely hazardous and must be contained properly. Information regarding the degree and immediacy of risks posed by continued on-site storage, i.e., whether delay may increase risks, appears essential to an understanding of Congressional intent as to remedies and judicial review of DOE's failure to meet a deadline to begin to dispose of nuclear waste.

During and even before consideration of the Act, Congress, and interested regulators, contemporary scientists, and industry representatives clearly were aware of prominent and credible reports agreeing that on-site storage of nuclear waste did not pose any risk to human health or safety, or the safety of the environment, within the following twenty years, and possibly not for 70 years.

The NRC's 1984 "Waste Confidence Decision," which was prepared at the D.C. Circuit's 1979 direction, to evaluate whether alternative disposal technology might become available before the utilities' licenses expired, and whether waste might be stored safely on-site until then, see **Minnesota v. NRC**, 602 F.2d 412, 416-17 (D.C. Cir. 1979), concluded that "experience with spent fuel storage provides an adequate basis for confidence in the continued safe storage of spent fuel in water pools either at or away from the reactor site for at least 30 years after expiration of the plant's [40-year] license," see 49 Fed. Reg. 34658, 34683, n. 20 (August 31, 1984), codified at 10 C.F.R. Parts 50 and 51.\18

The NRC's conclusion that extended on-site storage posed minimal adverse effects on safety and the environment was based on the Commission's "experience in more than 80 individual evaluations of the safety of spent fuel storage." See 49 Fed. Reg. 34680. The Waste Confidence Decision justified issuance of numerous license amendments allowing expansion of on-site storage by re-racking within wet fuel pools and using dry-cask storage. See Report on H.R. 3809, pt. 1, at 37 (advances in "at-reactor storage technology" obviate need for additional centralized interim storage capacity).

Prior to the enactment of the NWPA, Rep. Edward J. Markey opposed the repository solution on similar grounds: "it should be stated with perfect clarity that there is no short-term interim nuclear waste storage problem. Technology is

---

\18 The view that continued on-site storage is not unduly hazardous was reiterated recently by the former chairman of the NRC, Richard Meserve, who concluded that "we have the capacity to store [SNF] safely [on-site] for a period of decades." See Press Release, Nevada Gov. Kenny Guinn, NRC, Nuclear Industry Admit Yucca Mountain Not Necessary, (March 19, 2002), (http://www.state.nv.us/nucwaste/ news2002/nn11721.htm).

presently available to store waste which is on-hand . . . and will be generated in the next few years." See Report on H.R. 6598, pt. 1, at 118 (dissenting view).

In 1981, the former chairman of Carolina Power & Light, Sherwood H. Smith, Jr., also testified that surface and near-surface means of storage could be used into the indefinite future. See Radioactive Waste Legislation: Hearings on H.R. 1993, H.R. 2800, H.R. 2840, H.R. 2881, H.R. 3809 Before the Subcomm. on Nuclear Regulation of the Senate Comm. on Interior and Insular Affairs, 97th Cong. 304 (1981).

In addition, the legislative histories of the Act and of its 1980 predecessor frequently note that expanding on-site storage of waste, as by using dry-cask storage, is safer and more economical than transporting waste to an interim storage facility until a central repository is constructed. See, e.g., H.R. REP. NO. 96-1156, pt. 3, at 27 (1980) (endorsing amendments by the House Committee on Science and Technology that advocate expansion of dry-storage).

Nowhere in the legislative history, prior legislative proposals, or even the Act's findings, see Section 111(a), has Congress fixed a date beyond which on-site SNF storage would pose intolerable (or any) risks to health, safety, or the environment.\19 The Act's findings are vague and do not reveal whether scientific, practical, or political reasons (or some combination of these) make on-site accumulation of radioactive waste a "problem" that is a subject of "public concern," and that might "adversely affect public health and safety or the environment." Sections 111(a)(2), 111(a)(7).

---

\19 See NATIONAL ACADEMY OF SCIENCES ("NAS"), TECHNICAL BASES FOR YUCCA MOUNTAIN STANDARDS 14-15 (National Academies Press 1995) (technical standards prepared pursuant to the Energy Policy Act of 1992, Pub. L. No. 102-486, Title VIII § 801) (questioning whether calculating the benefits of the Yucca Mountain site "might not be strengthened by a careful appraisal of the probable costs and risks of continuing the present temporary waste disposal practices and storage facilities as compared to those attaching to the proposed repository. No such comprehensive appraisal is now available.").

The court has been unable to identify the provenance of the January 31, 1998 disposal deadline in Section 302(a)(5). Specifically, there is no suggestion in the legislative materials that this date was prompted by Congressional concern that on-site storage, or the utilities' on-site storage expenses, must cease by that date.\20

Nevertheless, it is clear that, to allay public fears, Congress deemed it essential both to have a schedule for emplacing SNF in a repository, and to have one that looked serious. See Section 111(b)(1) ("Purposes") ("to establish a schedule for the siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by [such SNF] as may be disposed of in a repository"). This appears to explain the use of the most optimistic predictions extant regarding the speed with which one could be built in setting the milestones in Subtitle A of Title I. Of course, since a repository had never been designed or built, or a site selected and agreed upon, or even site considerations or guidelines drafted or proposed, see Section 114, the deadlines in Title I, Subtitle A reflect uneducated guesses, at best.

---

\20 Although Congressional witnesses stressed the need for schedules, they deemed unrealistic those ultimately adopted in the Act. For example, Thomas Cotton, Director of the Congressional Office of Technology Assessment, stated that "the schedule can be seen as optimistic, since it appears to assume that everything will go right the first time." Disposal Policy: Hearing on H.R. 1993, H.R. 2881, H.R. 3809, and H.R.5016 Before the Subcomm. on Energy Conservation and Power of the House Comm. on Energy and Commerce, 97th Cong. 593 (1982). Similarly, James Devine, Assistant Director of Geological Engineering, United States Geological Survey ("USGS"), expressed the prescient warning that "it is highly unlikely that sufficient earth-science information will be available . . . for three candidate sites to be selected objectively." Nuclear Waste Disposal: Joint Hearing on S. 637 and S. 1662 Before the Senate Comm. on Energy and Natural Resources and Senate Subcomm. on Nuclear Regulation, 97th Cong. 323 (1982).

## D. Implementation of the Act

The NWPA authorized contracts for waste storage but, as to their contents, specified only that they must provide (1) that, following commencement of operation, the Secretary must take title to the SNF as expeditiously as practicable upon request, see Section 302(a)(5)(A), and (2) that, in return for fee payments, beginning not later than January 31, 1998, the DOE will begin to dispose of the SNF, see Section 302 (a)(5)(B). The Act provides no guidance in Section 302(a)(5), or in the immediately-following direction that "writ[ten] criteria setting forth the terms and conditions under which such disposal services shall be made available," as to whether these criteria must be published in a rule-making, see Section 302(a)(6). Nor does it appear to specify whether individual contracts or a standard format must be used.\21

DOE exercised its inherent authority to use a formal rule-making to promulgate the Standard Contract. See 5 U.S.C. § 553. There appears to have been no challenge to this decision.

During the standard contract rule-making, DOE allowed oral presentations, and provided detailed and specific responses to the comments and criticisms of the utilities regarding the scope and operation of the standard contract. See 48 Fed. Reg. 5,458 (Feb. 4, 1983) ("Standard Contract for the Disposal of Spent

---

\21 In contrast, Section 136(a)(1), which requires the Secretary to enter into contracts for interim storage, is worded very similarly to Section 302(a)(1), but, unlike the Title III provision, appears to contemplate individualized contracts ("Each such contract shall provide . . ." in Section 136(a)(1), as compared to "Such contracts shall provide . . ." in Section 302(a)(1)). The requirement to establish written criteria for services to be provided in the contracts is identical, save for the description of the services as "storage services," in Section 136(a)(4), and "disposal services" in Section 302(a)(6). Neither section requires a standard contract format, or promulgation by notice and comment rule-making. Unlike the disposal services "Standard Contract," however, the interim storage contracts were not treated as a Standard Contract or published for public comment.

Nuclear Fuel And/Or High-Level Radioactive Waste" (Proposed Rule)); 48 Fed. Reg. 16,590 (April 18, 1983) (Final Rule codified at 10 C.F.R. part 961).

The utilities participated extensively in the initial drafting of the Standard Contract regulation, even before the notice of proposed rule-making was published. Over 80 utilities, industry organizations, public interest groups, and others actively participated in the comment process.

DOE refused to accept a significant number of the utilities' demands and suggestions, including, notably, their requests for penalties (storage costs were suggested) should DOE fail to meet the disposal deadline and for specific acceptance rates. See, e.g., App., Def.'s MPSJ/Rate at 35-36 (Statement of Michael C. Cook, Vice-President, Contracts, Fuels, and Corporate Development, Florida Power, March 1, 1983).

DOE struggled to meet the numerous optimistic statutory deadlines for preparing guidelines and a mission plan, consultation, site evaluation, and obtaining regulatory approvals set out in Title I, Subtitle A—each milestone dependent on the cooperation of entities essentially beyond DOE's control. See Sections 112-119, 301. As a result of delays and rising costs, Congress amended the Act in 1987 to permit only one permanent repository, at Yucca Mountain, Nevada, and to permit an MRS site of up to 10,000 MTUs, for which construction could not commence until the Yucca Mountain repository was licensed by the NRC.

In the event Yucca Mountain proved unsuitable, DOE was directed simply to terminate site-specific activities and report to Congress. See 42 U.S.C. § 10133(c)(3). There is no indication in the legislative history of the 1987 amendments to the Act that Congress anticipated that DOE might become liable to pay enormous SNF storage and other costs, beginning in 1998, due to the delay in construction of the repository, or if repository construction were discontinued due to unsuitability, even though it was clear by then that the Yucca Mountain site had insufficient capacity to store all of the SNF that would be generated by the time the repository was due to be completed, or before another repository could

be selected, approved, and built. See 42 U.S.C. § 10134(d) (capacity of repository could not exceed 70,000 MTUs).

In 1994, DOE issued a Notice of Inquiry on Waste Acceptance Issues, which: (1) revealed the unsurprising news that the agency could not begin accepting SNF before the January 31, 1998 deadline in Section 302(a)(5)(B); (2) requested comments on the adequacy of reactor site storage after the deadline; and (3) disclosed a legal opinion that it lacked authority to remove SNF from reactor sites until there was an operational facility or repository ready for the emplacement of SNF. See n.7, supra. The Final Notice reaffirmed these conclusions. See n.8, supra.

As of now, the repository at Yucca Mountain remains unbuilt and its prognosis is not good. See GAO Report at 4 ("DOE is unlikely to achieve its goal of opening a repository at Yucca Mountain by 2010"). See also **Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency**, 373 F.3d 1251, 1273 (D.C. Cir. 2004) (agency's interpretation of environmental risk standards to be used for planning construction of a repository at Yucca Mountain did not comport with the "prevailing statutory scheme" because it failed to comply with statutory requirement to incorporate the National Academy of Science's technical standards, which imposed a one-million-year safety-compliance standard).

## IV. DISCUSSION

### A. Subject Matter Jurisdiction

A court possesses the power, and is under the obligation, to raise and decide the adequacy of its jurisdiction at any point in the litigation, sua sponte, even if the parties ignore the issue. See **Kontrick**, 124 S.Ct. at 915 (citing **Mansfield, C. & L.M. Ry. Co.**, 111 U.S. at 382 (challenge to a Federal court's subject-matter jurisdiction may be made at any stage of the proceedings and the court should raise the question sua sponte)); **Capron v. Van Noorden**, 2 Cranch (6 U.S.) 126, 127 (1804) (judgment loser successfully raised lack of diversity jurisdiction for the first time before the Supreme Court)); United States Court of Federal Claims Rule ("RCFC") 12(h)(3) ("Whenever it appears by suggestion

of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). See also **Special Devices, Inc. v. OEA, Inc.**, 269 F.3d 1340, 1342-43 (Fed. Cir. 2001) (citing **Johannsen v. Pay Less Drug Stores N.W., Inc.**, 918 F.2d 160, 161 (Fed. Cir. 1990)).

Thus it is said that a court has "inherent jurisdiction to determine the scope of [its] own jurisdiction." **Haines v. Merit Sys. Prot. Bd.**, 44 F.3d 998, 999 (Fed. Cir. 1995).

Jurisdiction is "limited to those subjects encompassed within a statutory grant of jurisdiction . . . . no action of the parties can confer subject matter jurisdiction upon a federal court," see **Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee**, 456 U.S. 694, 701-02 (1982), including "waiver or acquiescence" of the parties. See **In re Alappat**, 33 F.3d 1526, 1530 (Fed. Cir. 1994) (en banc).

Nor may it be conferred by another court. See **United States v. Cook County**, 170 F.3d 1084, 1091-92 (Fed. Cir. 1999) (district court decision to order transfer pursuant to 28 U.S.C. § 1631 reviewed de novo and held to be erroneous when jurisdiction in Court of Federal Claims was precluded by 28 U.S.C. § 1500). Contractual language also cannot confer jurisdiction. See **Florida Power**, 307 F.3d at 1370-71 (parties' statement that uranium enrichment contract was subject to the Contract Disputes Act, 41 U.S.C. §§ 601-613, held to be merely "contractual language . . . that cannot confer jurisdiction") (citing **Ins. Corp. of Ireland**, 456 U.S. at 701-702).

Most of the plaintiffs in these cases previously filed motions for summary judgment that the Federal Circuit's decisions in **Northern States Power Co. v. United States**, 224 F.3d 1361 (2000) ("**Northern States III**"), or **Maine Yankee Atomic Power Co. v. United States**, 225 F.3d 1336 (2000) were preclusive on the issue of liability. Few of these motions were granted.[\22]

---

\22 Defendant's motions assume liability for breach of contract, as was (continued...)

While binding in most other respects, including on the parties, see **Christopher Village, L.P. v. United States**, 360 F.3d 1319, 1329-30 (Fed. Cir. 2004) ("the fact that a court did not have jurisdiction over a suit in which it issued a decision does not automatically strip that decision of preclusive effect"), **Maine Yankee** and **Northern States III** are not binding on the question of jurisdiction if, as it appears here, jurisdiction was never explicitly raised to or decided by either court.

Longstanding precedent holds that, unless the prior court actually and directly addressed a particular jurisdictional issue, the mere exercise or assumption of jurisdiction does not constitute binding precedent on the jurisdictional point, even in similar cases. E.g., **Pennhurst State School & Hosp. v. Halderman**, 465 U.S. 89, 119 (1984); **Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.**, 272 F.3d 1365, 1378 (Fed. Cir. 2001) ("'We are not bound by previous exercises of jurisdiction in cases in which our power to act was not questioned but was passed sub silentio . . . '" (quoting **Brown Shoe Co. v. United States**, 370 U.S. 294, 307 (1962))); see also **Florida Power**, 307 F.3d at 1371; **Special Devices**, 269 F.3d at 1346.

On the same point, the Supreme Court in **Brown Shoe** (harking back to **New v. Territory of Oklahoma**, 195 U.S. 252, 256 (1904)), noted Chief Justice Marshall's response, in **United States v. More**, 3 Cranch (7 U.S.) 159, 172 (1805), "to a contention that the Court was bound on a jurisdictional point by its consideration, on the merits [of **United States v. Simms**, 1 Cranch (5 U.S.) 252, 253-54 (1803)], when the jurisdictional question had gone unnoticed." The Chief

\22(...continued)
decided in plaintiff Florida Power's case by order of this court (Wilson, J.) on January 11, 2002. Should the court dismiss the complaint for lack of subject matter jurisdiction, this liability decision obviously would be vacated, as improvidently granted. Because plaintiff Florida Power's case is not here on remand, law of the case principles are inapplicable. See **Gould, Inc. v. United States**, 67 F.3d 925, 930 (Fed. Cir. 1995) (law of the case doctrine bars trial courts on remand from re-litigating issues decided by the appellate court).

Justice stated: "'No question was made, in that case, as to the jurisdiction. It passed sub silentio, and the court does not consider itself as bound by that case.'" **Brown Shoe**, 370 U.S. at 307.

Similarly, in **The Edward**, 1 Wheat (14 U.S.) 261, 276 (1816), the Court declared: "It may be, and has been, said that the opinion here expressed is at variance with the public opinion . . . and some other officers of government; and that even this court has condemned property for the same offense with which the Edward is charged. The answer to all this is, that the condemnation alluded to passed sub silentio, without bringing the point distinctly to our view, and is, therefore, no precedent."

Again, it must be pointed out that the Federal Circuit, in its decisions with respect to DOE's liability under the Standard Contract in **Maine Yankee**, 225 F.3d 1336, and **Northern States III**, 224 F.3d 1361, did not address the question of its jurisdiction under the Act, or under Section 119 thereunder.

B. Jurisdictional Authority

Section 119(a), in Title I, Subtitle A, of the Act states (in pertinent part) (emphases added):

> (1) . . . . [t]he United States courts of appeals shall have original and exclusive jurisdiction over any civil action—
>
> > (A) for review of any final decision or action of the Secretary , the President or the Commission under this subtitle;
> >
> > (B) alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this subtitle;

* * *

> (2) The venue of any proceeding under this section shall be in the judicial circuit in which the petitioner involved resides or has its principal office or in the United States Court of Appeals for the District of Columbia.

Neither Section 119 nor any other section of the Act indicates where jurisdiction lies for challenges to agency actions under Section 302 of Title III, which is the provision principally at issue in these SNF cases, or, for that matter, for challenges to any other DOE action in Title III.

Soon after enactment of the NWPA, the D.C. Circuit decided that the omission of a jurisdictional provision applicable to Title III created sufficient ambiguity to justify recourse to the legislative history for guidance. See **Gen. Elec.**, 764 F.2d at 901-02 n. 32 (citing **Wisconsin Elec. Power Co. v. Hodel**, 626 F.Supp. 424 (D.D.C. 1984), aff'd 778 F.2d 1 (D.C. Cir. 1985) ("**Wisconsin. Elec. I**")).\23 On the basis of this review, the D.C. Circuit concluded that Congress intended the courts of appeals' original and exclusive jurisdiction to include cases involving Section 302 .

This court's review of the statute reveals numerous ambiguities over and above its glaring silence regarding the forum for judicial review of actions arising under Title III.

Title III, including Section 302 itself, is replete with errors and ambiguities.

---

\23 Although, in **Natural Res. Def. Council, Inc. v. Abraham**, 244 F.3d 742, 746-47 (9th Cir. 2001), the Ninth Circuit held that it lacked original or exclusive jurisdiction over a petition challenging a DOE order under the NWPA, the court so decided because the challenge concerned another statute altogether

The following errors or ambiguities in Section 302 stand out:

1. Section 302(a)(5)(B) of Title III, the precise provision upon which plaintiffs' suit is brought, recites that "the Secretary . . . . will dispose of the [SNF] as provided under this subtitle," notwithstanding that Title III contains no subtitles and that the Act's four subtitles all appear in Title I. (Emphasis added.)

2. Section 302(d), governing use of the Fund, also refers to "this subtitle," stating that "no funds may be expended under this subtitle" for an unauthorized facility. (Emphasis added.)

3. Section 302(e)(5), dealing with Fund administration, again refers to the Secretary's "responsibilities under this subtitle." (Emphasis added.)

4. Section 302(d) of Title III permits use of the Fund "only for purposes of radioactive waste disposal activities under Titles I and II," including six categories of activities, some of which appear to overlap with Title III, particularly Section 302(d)(3) (administrative cost of the program).

5. Section 302(a)(3) refers to "subsection (c) 126(b)," as the provision establishing the Fund, even though the provision that accomplishes this is found in Section 302(d), and the Act contains no Section 126 (or Sections 127 to 130).

The findings and purposes of the Act, laid out in Section 111(a) and (b), respectively, of Title I, Subtitle A, also interact with and even incorporate Title III, referring to the major activities of the DOE under Section 302—"to establish a Nuclear Waste Fund composed of [fee] payments made by the generators and owners of such waste and spent fuel," see Section 111(b)(4), and to ensure that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel," see Section 111(a)(4).

Because a legal challenge to an activity under Title I is highly likely to implicate one or more of DOE's activities under Title III, section 302—such as administering the Fund, fee-setting, and funding the programs and activities thereunder—it is difficult to believe that activities under Section 302 would have

been excluded intentionally from Subtitle A of Title I for purposes of judicial review under Section 119. See, e.g., **Nevada v. Herrington,** 827 F.2d 1394, 1398 (9th Cir. 1987) (noting that the Nuclear Waste Fund also covers the costs of activities under Title I, such as " participation by states and Indian tribes in repository site selection, development, and operation and . . . impact assistance to states where repositories have received construction authorization from the Commission").

The foregoing errors and ambiguities already indicate that, in divorcing portions of Title III, including Section 302(a), from Title I, Subtitle A, Congress inadvertently failed to specify that Section 119 would continue to apply to legal challenges under Section 302. This issue must be addressed by recourse to the legislative history of the Act.

C. Statutory Construction

In 1805, Chief Justice Marshall summarized the core principle of statutory construction: "Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction." See **United States v. Fisher**, 2 Cranch (6 U.S.) 358, 399 (1805); see also **Hughes Aircraft Co. v. Jacobson**, 525 U.S. 432, 438 (1999) ("our analysis begins with 'language of the statute.' And where the statutory language provides a clear answer, it ends there as well." (quoting **Estate of Cowart v. Nicklos Drilling Co.**, 505 U.S. 469, 475 (1992))).

However, it is equally well-established that there are occasions, rare though they may be, "when a court must conclude that the words used by the Congress did not capture the Congressional intent," as when "a literal application of the statute produces a result so unlikely that Congress could not have intended it." **VE Holding Corp. v. Johnson Gas Appliance Co.**, 917 F.2d 1574, 1579-80 (Fed. Cir. 1990) (citing **United States v. Turquette**, 452 U.S. 576, 590 (1981) and **United States v. Ron Pair Enters., Inc.**, 489 U.S. 235, 242-43 (1989)); see

also **Norfolk Dredging Co., Inc. v. United States**, 375 F.3d 1106, 1110 (Fed. Cir. 2004). This case presents such a situation.[\24]

D. Legislative History

The current Act is the product of three bills introduced in the House of Representatives during the 97th Congress: H.R. 3809 (Committee on the Interior); H.R. 6598 (Committee on Energy and Commerce); and H.R. 5016 (Committee on Science and Technology). Each of the first two bills contained a substantially identical Title I, Subtitle A, titled "Repositories for Disposal of [SNF]," both of which included a judicial review provision designated Section 119.

All three bills restricted judicial review to Federal courts of appeals, although H.R. 3809 and H.R. 5016 limited jurisdiction only to the D.C. Circuit, whereas in H.R. 6598 review was permitted in the D.C. Circuit or any other Federal appeals court having proper venue.

Section 119 in H.R. 3809 and H.R. 6598 was substantially similar to the current Section 119. Each bill also included, within its Title I, Subtitle A, an analog to current Section 302, denominated Section 124 in H.R. 3809 and Section 123 in H.R. 6598. See Report on H.R. 3809, pt. 1, at 15-18 ("Section 124(a) authorizes the Secretary to contract with utilities . . . to provide repository services in return for payments by repository users to cover program costs"); Report on H.R. 6598, pt. 1, at 77 ("Section 123(a)(1) authorizes [DOE] to enter into contracts . . . for the disposal of [SNF]. Contracts are required to establish fees and charges to offset all expenditures").

When the three bills were reconciled and introduced as H.R. 7187 (a substitute for H.R. 3809), see 128 Cong. Rec. H26306 (Sept. 30, 1982),

---

\24 It also is "an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." **Transamerica Mortgage Advisors, Inc. v. Lewis**, 444 U.S. 11, 19 (1979).

provisions from the Science and Technology Committee bill were placed in Title II ("Research, Development, and Demonstration Regarding Disposal of [SNF]"). This displaced the former Title II ("Other Provisions Relating to Radioactive Waste"), provisions from which were re-located to Sections 303 ("Alternate Means of Financing") and 304 ("Office of Civilian Radioactive Waste Management") within the new Title III.

Section 124 of H.R. 3809 and Section 123 of H.R. 6598 also were moved to the newly-created Title III, even though their subject matter bore no particular relationship to that of the new Sections 303 and 304. Why they were moved is unclear. Nothing in the legislative history suggests a substantive reason for doing this that it was in any way related to judicial review.

Because Title II was new and came from a different bill, the need to spell out such matters as judicial review may have been clearer, while a clarification that Section 119 review continued to apply to Section 302 in its new location may have been deemed unnecessary or, more probably, like the many housekeeping errors and omissions apparent throughout Section 302, listed supra, simply overlooked.

The purpose of designating the courts of appeals as the fora for judicial review is clearer, Congress having emphasized that "expedited judicial review of court challenges to the program as it is implemented," was one of the "essential elements of the [repository] program," see Report on H.R. 3809, pt. 1, at 30.

The requirement that Federal agencies provide "Expedited Authorizations" of applications needed for the repository program, and that these "take precedence over similar applications not related to such repositories," see Section 120, also reveals Congress' concern that dilatory legal procedures, which we may presume to include the delays compelled by the demands of trial court litigation, not be allowed to delay the repository schedule unduly. See **Tennessee v. Herrington**, 806 F.2d 642, 649 (6th Cir. 1986) (holding that Congress' intent of timely implementation of the nuclear waste program would be frustrated by the "seemingly irrational bifurcated system" of reviewing certain

portions of the Act in the district courts (those regarding MRS facilities, in Title I, Part C, which the Act also omits from Section 119), and others in the circuit courts, and that the Act should not be so interpreted, lacking clear Congressional intent to the contrary (citing **Crown Simpson Pulp Co. v. Costle**, 445 U.S. 193, 197 (1980))).

More importantly, the activities in Title III, such as preparation of a mission plan, overseeing the administration and use of the Waste Fund, setting fees and disposal schedules, and deciding the quantities of SNF to be transported and disposed of are integral parts of the repository program established in Title I, as is clear both from the nature of these activities, and from Title I, Subtitle A, Section 111 ("Purposes and Findings"), which describes key Section 302 responsibilities, including: "to establish the Federal responsibility and a definite federal policy for the disposal of [SNF]," see Section 111(b)(2), and "to establish a Nuclear Waste Fund . . . that will ensure that the costs of carrying out activities relating to the disposal of such [SNF] will be borne by the persons responsible for generating such [SNF]," see Section 111(b)(4).

It is only logical that a legal challenge to an activity under Title I, Subtitle A, might be inextricably related to a corresponding funding or disposal decision under Title III. As may be seen in this case, a challenge to disposal standards under Section 302 may create DOE delays in accomplishing other predicate milestones set out in Title I, Subtitle A, or bankrupt the Fund. It appears unlikely that a Congress focused on preventing litigation delay and ensuring prompt construction of a repository could have intended to permit such related challenges to be brought simultaneously in a trial and an appeals court.

It also is highly unlikely that Congress anticipated paying damages as a result of a suit for breach of contract in this court. One of the hallmarks of NWPA's legislative history was that Congress intended that the costs of nuclear waste disposal, as well as interim storage, would be the "responsibility of the generators and owners of such waste and spent fuel." Sections 111(a)(4), (a)(5). See also Report on H.R. 3809, pt. 1, at 30, Report on H.R. 6598, pt. 1, at 38, H.R. REP. NO. 96-1186, pt. 2, at 33 (1980). Shifting the costs of SNF storage to

those who are not consumers of nuclear power would frustrate Congressional intent.

There is also no evidence that Congress intentionally retained the phrase "under this subtitle" in Section 119 to preclude its application to the judicial review of challenges to DOE actions under Section 302.

In sum, the legislative history strongly suggests that the Act's failure to specify that review of DOE actions (or failures to act) under Section 302 was available pursuant to Section 119 (only) was not intentional, but represented a drafting error or oversight that obviously resulted in "the words used by the Congress . . . not captur[ing] the Congressional intent." **VE Holding Corp.**, 917 F.2d at 1579-80. Clearly, "a literal application of the statute, resulting in judicial review of the same issues in both trial and circuit courts of appeal "produces a result so unlikely that Congress could not have intended it." **Id.**

The absurdity of this result explains why the D.C. Circuit and courts of appeals (with one exception),[\25] other than in this circuit, consistently have asserted original and exclusive jurisdiction over disputes regarding Section 302 ("Nuclear Waste Fund") and the disposal contract and fee provisions thereunder, as discussed below.

E. Judicial Interpretations

Soon after passage of the Act, in the first case concerning DOE's actions under Title III, the D.C. District Court dismissed a challenge to DOE's rule for setting one-time fees under Section 302(a)(3), after rejecting DOE's arguments that it lacked subject matter jurisdiction. See **Gen. Elec. Uranium Mgmt. Corp. v. DOE**, 584 F.Supp. 234 (D.D.C. 1984) ("The flaw in [DOE's] argument is that § 302 does not fall within the same 'part' as § 119"). The utility appealed the dismissal, and also sought direct review in the D.C. Circuit. After extensive analysis of the jurisdictional issues, the circuit court concluded that judicial

\25 **Wisconsin Elec. II**, 211 F.3d at 648 (holding that jurisdiction over contract breach lay with the Court of Federal Claims).

review over Section 302 challenges was vested originally and exclusively in the courts of appeals pursuant to Section 119, and that the agency did not abuse its discretion in setting these fees. See **Gen. Elec.**, 764 F.2d 896, 900-908 (D.C. Cir. 1985).

The court in **General Electric** decided that the structure, legislative history and policy considerations underlying the Act "overwhelmingly support[ed] its conclusions," and found it "inconceivable" that Congress intended all actions concerning waste disposal other than questions concerning the composition of the Nuclear Waste Fund and the other matters located in Title III, to be held in the courts of appeals. **Id**. at 901-02.

Specifically addressing the reference in Section 119(a)(1)(A) to "under this [subtitle],"[\26] and the goal of setting up the Nuclear Waste Fund, which appears in Section 111, within subtitle A of Title I, the court decided that "[t]he mere fact that Congress granted the Secretary the authority to enter into contracts to provide for the payment of those disposal costs in a different sub[title] does not compel the conclusion that Congress thereby intended that there would be entirely different judicial review procedures for those contracts." **Id.** at 902. It concluded that DOE's rule setting the one-time fee in Section 302(a)(3) was "well within the class of agency actions reviewable under Section 119(a)(1)(A)." **Id.** at 901.

The D.C. Circuit summarized its conclusions as follows:

> "First, despite the statute's lack of clarity, we find every indication from those sections of the statute relied on by DOE, as well as from related sections, and from the structure of the statute as a whole, that Congress intended that the court of appeals would have original and exclusive jurisdiction in cases of this sort.

---

\26 The D.C. Circuit referred to the codified statute, not the Act itself, thus referring, e.g., to Title I as Subchapter I, and to "subtitle A" as "Part A."

> Second, the legislative history, although not illuminating on this question, certainly does not compel a result contrary to the one we reach here.
>
> Third, the policy considerations underlying this case, and articulated in other judicial decisions covering analogous statutes, overwhelmingly support our conclusions."

**Id.** at 901.

The court in **Wisconsin Electric I** (which was affirmed by the D.C. Circuit shortly after its **General Electric** decision, see 778 F.2d 1, 3 (D.C. Cir. 1985)), also held that jurisdiction lay in the appellate court, concluding that the introductory sentence to Section 302 (authorizing the Secretary to enter into contracts "[i]n the performance of his functions under the Act"(emphasis added)) incorporated the entire Act. It also stated:

> "[A]ll of the reasons why a rule making by a department or agency should be reviewed directly in a court of appeals apply with full force here. The rule making record and the original fact findings were made by and for the Secretary. There is little or no fact collecting or fact finding role for a trial court. The Secretary's interpretation of the statute (unlike a trial court's) is cushioned by expertise and, in this case, by his (or his staff's) live experience with the proposal, hearing, mark-up, and enactment of the Act. The Court of Appeals must inevitably review this Court's interpretation of the Act, essentially de novo. A trial court's interpretation would be, at best, modest assistance to the Court of Appeals."

**Id.**, 626 F.Supp at 426-27.

In **Commonwealth Edison v. DOE**, 877 F.2d 1042, 1045 (D.C. Cir. 1989), the D.C. Circuit again found that there was "no question" it had jurisdiction under

Section 119(a)(1) to entertain a challenge to the Treasury bill rate applied by DOE pursuant to the Section 302(a)(4) fee provision.\27

Thereafter, the D.C. Circuit decided a series of cases spawned by the DOE's conclusion, in its published notices, that it would not be able to accept SNF before January 31, 1998, or 2010, because no repository would be constructed before then, but that the Act did not require DOE to accept SNF until a repository was operational. In **Northern States Power Co. v. DOE**, 1995 U.S. App. LEXIS 22422 (D.C. Cir. 1995) ("**Northern States I**"), the utilities' challenge to the first notice (filed initially in the appellate court, it seems) was dismissed because there had been no final agency action.

In **Indiana Michigan**, 88 F.3d at 1277, the appellate court, again exercising jurisdiction over a Title III challenge, vacated the decision of the Secretary, and held that DOE was obliged to begin accepting SNF even in the absence of a repository. The court declined, however, to provide a remedy prior to the 1998 deadline, and thus remanded for further proceedings.

The waste acceptance issue returned (again, to the circuit court) in **Northern States Power Co. v. DOE**, 128 F.3d 754 (D.C. Cir. 1997) ("**Northern**

---

\27 No circuit court other than the D.C. Circuit in **Wisconsin Electric II** has declined jurisdiction based on the lack of any reference in Section 119 to Title III. See **Alabama Power Co. v. DOE**, 307 F.3d 1300 (11th Cir. 2002) (exercising jurisdiction over Title III fee settlement issue); **Natural Res. Def. Council, Inc. v. Abraham**, 244 F.3d 742 (9th Cir. 2001) (recognizing value of concentrating all actions that contest final DOE decisions under NWPA in the courts of appeals—and commending the D.C. Circuit's decision in **General Electric**—but dismissing because the challenged order was not a "decision 'under' Part A of Subchapter I or of any other section of NWPA but, rather, under the Atomic Energy Act"); **Nat'l Ass'n of Regulatory Utility Comm'rs v. DOE**, 851 F.2d 1424 (D.C. Cir. 1988) (in challenge to methodology of fee-setting pursuant to Section 302, "Notice" found not presently ripe for review and, on the merits, DOE held not to abuse its discretion in denying petitions for rule-making).

**States II**"), via a petition for a writ of mandamus requiring DOE to comply with the Standard Contract and with the court's holding in **Indiana Michigan**. The court enjoined the DOE from "advancing any construction of the Standard Contract that would excuse its delinquency on the ground that it has not yet established a permanent repository or an interim storage program." **Northern States II**, 128 F.3d at 756. (Presumably, this was intended to enjoin only the agency's programmatic resistance to the court's orders, and not to bar either the Department of Justice or the DOE from making such arguments in court, for example, in an appeal of that ruling.)

Finding that the mandamus standards were met, and that the statute "does not prescribe a particular remedy in the event that the Department fails to perform on time," **Northern States II** held that the Standard Contract's scheme for dealing with "avoidable" delays, which required equitable adjustment to "reflect [the utilities'] additional costs," was not an inadequate remedy. **Id.** at 759. Thus, it ordered DOE to proceed with its contractual remedies, but retained jurisdiction pending compliance with the mandate, and did not designate this court as the forum in which the petitioners might seek relief. **Id.** at 761.

Not until the decision in **Wisconsin Electric II**, 211 F.3d 646, did the D.C. Circuit, or any other court, conclude that disputes regarding agency actions under the NWPA belonged elsewhere than in a Federal court of appeals.[\28] The D.C.

---

\28 The D.C. Circuit follows the rule of inter-panel accord, under which the decision of one panel is the law of that circuit until it is reversed en banc. See **Save our Cumberland Mountains, Inc. v. Hodel**, 826 F.2d 43, 49 (D.C. Cir. 1987) (this panel is bound by the position of a previous panel as the "law of the circuit 'whether or not [it] is correct,' and binds us unless and until overturned by the court en banc or by Higher Authority") (Ginsburg, J., concurring (quoting Court's Opinion at 48)).

Therefore, the holdings in **General Electric** and **Commonwealth Edison** that the circuit court had jurisdiction under Section 119 of the Act over claims related to Title III, specifically Section 302, would bind subsequent panels of that (continued...)

Circuit in **Wisconsin Electric II** read the mandate of **Northern States II**, as prohibiting the DOE from interpreting the NWPA and its contracts with utilities in a manner that would relieve the DOE of its unconditional obligation to begin timely disposal of SNF. (It expressed no opinion about the relief the DOE would have to provide for its breach.) Although recognizing its jurisdiction to provide Section 119-type review, of: "(1) final action taken by the agency pursuant to the NWPA, and (2) the agency's failure to take any action required by the NWPA," the D.C. Circuit disavowed jurisdiction to enforce its prior mandates or to consider an action regarding a breach of the Standard Contract by DOE, because this did not breach a statutory duty. **Id.**, 211 F.3d at 648.

**Wisconsin Electric II** ultimately concluded that the proper forum for the adjudication of contract disputes was the Court of Federal Claims (citing **Transohio Sav. Bank v. Office of Thrift Supervision**, 967 F.2d 598, 610 (D.C. Cir. 1992) and **Yankee Atomic Elec. Co. v. United States**, 42 Fed. Cl. 223 (1998), aff'd 225 F.3d 1336 (Fed. Cir. 2000)), the court where these issues were already being litigated. **Id.**

As discussed supra, jurisdiction may not be conferred by the parties, by contract, or by another court, see **Cook County**, 170 F.3d at 1091-92 (district court transfer decision erroneous when jurisdiction in Court of Federal Claims precluded by statute); **Florida Power**, 307 F.3d at 1370-71 (parties' agreement to make uranium enrichment contract subject to the Contract Disputes Act, merely "contractual language . . . that cannot confer jurisdiction"). Therefore, the D.C. Circuit's preference for dispute resolution in this court does not suffice to create jurisdiction in this court or to void the requirements of Section 119 of the Act.

The U.S. Court of Appeals for the Eleventh Circuit also has asserted jurisdiction pursuant to Section 119 to decide a utility's challenge to a DOE action taken under the authority of Section 302 that clearly implicated Title III (the breach remedies in Article IX(B) of the Standard Contract). See **Alabama**

---

\28(...continued)
court, including **Wisconsin Electric II.**

**Power**, 307 F.3d at 1311 (deciding utilities' claim that a reduction of Exelon Generation Company's disposal fees pursuant Article IX(B) of the Standard Contract was tantamount to an improper expenditure from the Fund under Section 302(d)).

In sum, over the twenty-two year period since enactment of the NWPA, the U.S. Circuit Courts of Appeal appear consistently (with the exception previously referenced) to have exercised jurisdiction over petitions challenging DOE actions or failures to act under Title III of the Act, including Section 302, the provision at issue here, based on Section 119's grant of original and exclusive jurisdiction for those courts to review "any final decision or action of the Secretary, the President or the Commission."

Thus, the legislative history and structure of the Act, and longstanding judicial practice, appear to support the conclusion that a challenge to DOE's failure to accept waste by the date set out in Section 302(a)(5)(B) is a challenge to "the failure of the Secretary [of DOE] . . . to take any action[ ] required under [Title III of the Act]" under Section 119(a)(1)(B), and thus is an action falling within the original and exclusive jurisdiction of the appropriate Federal court of appeals.